

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-3-2002

# Thompson v. Comm HHS

Precedential or Non-Precedential: Non-Precedential

Docket No. 01-4022

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"Thompson v. Comm HHS" (2002). *2002 Decisions.* Paper 317.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/317

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 01-4022

WINNIE THOMPSON, Appellant

v.

WILLIAM A. HALTER, ACTING COMMISSIONER SECRETARY OF
HEALTH AND HUMAN SERVICES; LARRY G. MASSANARI,
COMMISSIONER OF SOCIAL SECURITY

_____

On Appeal From the United States District Court
For the Eastern District of Pennsylvania
(D.C. Civ. No. 01-cv-00974)
District Judge: Honorable Herbert J. Hutton

_____

Submitted Under Third Circuit LAR 34.1(a)
May 20, 2002
Before: BECKER, Chief Judge, GREENBERG, Circuit Judges,
and BARZILAY, Judge, U.S. Court of International Trade.

(Filed  June 3, 2002)

_____

OPINION

_____

BECKER, Chief Judge.

This is a social security disability case in which the plaintiff, Winnie Thompson, made an unsuccessful application for disability insurance benefits and supplemental security income under Titles II and XVI, respectively, of the Social Security Act.  42 U.S.C.  401-433, 1381-1383f.  The Administrative Law Judge (ALJ) decided that Thompson was not disabled because she could perform her past relevant work as an office cleaner.  This is an appeal from an Order of the District Court for the Eastern District of Pennsylvania granting the Commissioner of Social Security's motion for summary judgment and denying Thompson's motion for summary judgment in her action pursuant to 42 U.S.C.  405(g) and 1383(c)(3), for judicial review of the final decision of the Commissioner of Social Security.  For the reasons that follow we are satisfied that the Commission's decision was supported by substantial evidence, and we affirm.

I.

Thompson was sixty-one years old at the time of the ALJ's decision.  She has a seventh grade education, and last worked as an office cleaner at TV Guide headquarters from 1988 to 1991, where she took care of the executive floor, making sure that the bathrooms were stocked and the trash cans were emptied.  She also checked and stocked the first floor bathroom, checked the lobby for trash, and checked the doors for fingerprint smudges.  The gravamen of Thompson's case is that she was entitled to benefits on account of her poor vision.

Thompson's brief describes her problem in most dramatic terms:

> After December 31, 1991, when the contract for TV
> Guide was lost, she could not do her work elsewhere.  She
> was having problems in her left eye, and most of the vision in
> her right eye was gone.

> From December 31, 1991 through 1995 she had very

little vision in the right eye. It was as though the room was full of smoke and she had to fight her way through the smoke to be able to see anything. She could not read with her right eye. The vision in her left eye was not clear. She could see a little with glasses, but could not read or see anything up close. Things farther away were blurry and she could not make out detail. She wore dark glasses to protect her eyes from the sun. On September 4, 1996, she had corneal transplant surgery on the right eye.

After her right corneal transplant, the vision in her left eye deteriorated to the point where she could not see anything looking straight ahead. If she were to cock her head back and look down she could see a little something underneath. The vision in her right eye was better than it had been, but never became clear, and she saw everything double. She tried three different prescriptions of eye glasses, but was not able to wear them comfortably. When she took them off her vision was even more blurry.

She was only able to continue working at TV Guide because she knew where everything was. She did her job from memory. She could not do that elsewhere. Her coworkers understood her situation and made special accommodations that would not be available elsewhere. She could not see well enough to pick up trash, clean off a desk, mop a floor, run a dust mop or vacuum.

She cannot shop on her own, because she cannot identify the items visually. She goes with her daughter, who shops. Her daughter does things around the house such as making beds, vacuuming, sweeping, and mopping. To pick up something from the floor, she has to get down on her knees to be able to see what it is.

Thompson also makes stark claims in medical terms. Prior to her transplant surgery, her vision is said to have deteriorated to the point where the vision in her right eye was 20/400 and 20/70 in her left eye. After the corneal transplant, the vision in her left eye is said to have quickly deteriorated, accompanied by blurred and double vision. Visual acuity, measured shortly after surgery on October 1, 1996, was 20/70 on the right and 20/70-1 on the left, and she had lattice dystrophy also in the left eye, with recurrent erosion. By December 18, 1996, her central visual acuity, with best correction, was reported as 20/70 on the right and 20/800 on the left, and her percent of visual efficiency as 48% on the right and less than 12% on the left. According to a medical note, Thompson "had a history of lattice corneal degeneration bilaterally, with progressive blurring of vision. She will need a corneal graft also for the left eye." By March 4, 1997, the vision in her right eye was reported as 20/200.

II.

Thompson's legal argument is essentially that the ALJ erred in finding that she could return to her past relevant work as an office cleaner, an unskilled job performed at the sedentary to light to medium level of exertion, and that the ALJ failed to give appropriate weight to the medical evidence and her testimony. Unfortunately for Thompson, her medical evidence is not only tenuous, but also seriously undermined by other medical evidence in the record.

First, as the Magistrate Judge observed, much of the notes and records of Dr. Sulewski on which Thompson relies are illegible (or at least unintelligible). Second, the reports of both Dr. Sulewski and Dr. Nicklin, Thompson's family physician, indicate that she was in fact doing quite well. For example, Thompson told Dr. Nicklin that she was doing domestic work during this period, and that she was walking twenty blocks a day. If so, Thompson's vision problem was not so severe that it prevented her from doing her

past relevant work, in which case she was not entitled to disability benefits because she had not shown an onset of disability before December 31, 1995, the relevant date in this case.

Moreover, Dr. Sulewski, Thompson's treating ophthalmologist at the Scheie Eye Institute, repeatedly stated that the corneal transplant surgery which took place in September 1996 was "perfectly successful," produced a "great result," and that Thompson was "doing well" after surgery. According to the records of Dr. Sulewski that were before the ALJ, Thompson's best corrected vision in her right eye after surgery was recorded as follows: 20/40 between October and December 1996, 20/25 in March 1997, and 20/20 in November 1997.

In October 1996, Dr. Sulewski re-examined Thompson, noting that the sutures in her right eye were intact, the graft was clear, and her right eye was doing well. From October 1996 to November 1996, he found that Thompson's vision in her right eye was 20/40. Dr. Sulewski consistently reported that Thompson's right eye was "doing well." In March 1997, Thompson complained of "cobwebs" and floaters in her right eye. However, Dr. Sulewski noted that a new prescription for glasses would correct the vision in Thompson's right eye to 20/25.

In September 1997, Dr. Sulewski noted that surgery on Thompson's right eye had produced a "great result," and that her left cornea was cloudy secondary to lattice corneal dystrophy. In November 1997, Dr. Sulewski indicated that the corrected vision in Thompson's right eye was 20/20; he did not record corrected vision in the left eye. Most importantly, Dr. Sulewski never opined that Thompson could not work. Thompson argues that a statement of disability by a claimant's doctor is not essential to finding a claimant disabled. While the absence of such a statement is not dispositive of the issue of disability, it is surely probative of non-disability. See Hutton v. Apfel, 175 F.3d 651 (8th Cir. 1999) (a doctor's lack of physical restrictions on a claimant militates against a finding of disability); Dumas v. Schweiker, 712 F.2d 1545 (2d Cir. 1983) (the absence of indications in the record that an impairment was so severe that it rendered the claimant unable to work is probative evidence of non disability).

For all these reasons, we believe that the ALJ's decision is supported by substantial evidence. Thompson argues that the "ALJ misunderstood the notes of Dr. Sulewski," but does not provide any factual support for this contention. She suggests that the ALJ should have requested a consultative examination, but the ALJ's duty to develop the record does not require a consultative examination unless the claimant establishes that such an examination is necessary to enable the ALJ to make the disability decision. 20 C.F.R. 404.1517, 416.917; Turner v. Califano, 563 F.2d 669, 671 (5th Cir. 1977). Here, based on the existing medical records and the opinions of Thompson's doctors, the ALJ was entitled to decide that Thompson's vision impairment did not prevent her from doing her past relevant work. Thompson could have obtained a comprehensive letter from Dr. Sulewski clarifying his views on Thompson's visual acuity but no such document is in the record. The decision to order a consultative examination is within the sound discretion of the ALJ, see Jones v. Bowen, 829 F.2d 524, 526 (5th Cir. 1987), and we find no abuse.

Moreover, Thompson's subjective complaints are not consistent with the medical evidence. She testified that she was unable to read labels in the grocery store or to pick up objects from the floor, but she also testified that she did not wear the glasses prescribed by Dr. Sulewski because they made her eyes feel "tight." Dr. Nicklin consistently described Thompson as doing "well," and Thompson reported to Dr. Nicklin that she "[felt] good." Additionally, after her eye surgery, Dr. Nicklin reported that Thompson resumed her walking one or more hours every other day, and that she performed aerobics classes and domestic work.

### III.

In short, because the objective medical evidence and Thompson's self reported activities contradicted her testimony of disabling vision, the ALJ, as the finder of fact, had substantial evidence from which to conclude that Thompson did not suffer from disabling limitations. Credibility determinations as to a claimant's testimony regarding her limitations are for the ALJ to make.

We need not burden the record with a recitation of the well-known principles that govern review in this type of case. Suffice it to say that, based upon the foregoing discussion, Thompson failed to prove that she was disabled as defined in the Act. The

principal issue is whether, at step four of the sequential evaluation process, Thompson proved that her vision impairment precluded her from doing her past relevant work.  20 C.F.R.  404.1520(e), 416.920(e).  Here, the objective medical evidence, the evidence that Thompson only stopped working because her company lost its cleaning contract with TV Guide, the evidence that she worked as a cleaner after her layoff, and the evidence of her activities of daily living constituted substantial evidence that Thompson could do her past relevant work as a cleaner.  Thus, the ALJ properly found that Thompson was not disabled.

The Judgment of the District Court will be affirmed.

_____

TO THE CLERK:

Please file the foregoing Opinion.

BY THE COURT:


/s/ Edward R. Becker
Chief Judge